SANDY ROBLES,

        Plaintiff,

    v.                                       Case No. 18-cv-1809

BRUNSWICK CORPORATION
d/b/a MERCURY MARINE,

        Defendant.

## DEFENDANT'S RESPONSE IN OPPOSITION OF PLAINITFF'S MOTION FOR CONDITIONAL CLASS CERTIFICATION AND COURT FACILITATED NOTICE

### INTRODUCTION

Plaintiff Sandy Robles ("Robles") has requested that the Court conditionally certify a class of over 3,500 current and former production and maintenance employees (herein after referred to as the "purported class members") working in various plants and departments at Mercury Marine's Fond du Lac campus based on nothing more than the declarations of *three* individuals, and without relying on *any* testimony from Robles herself. The entire premise of Robles' claim is based on the theory that Mercury Marine has a "facially impressible" time rounding policy that only rounds in Mercury Marine's favor. She contends that conditional certification is appropriate based on this purported rounding policy and the fact that limited discovery has been conducted to date. She is wrong on all fronts.

Mercury Marine does not have an impermissible rounding policy. The Company utilizes lawful grace periods at the front and back end of employees' shifts (a longstanding practice recognized and agreed to by the employees' union representatives) so employees can punch in

and out of work at their convenience and with less congestion at the Company's time clocks. Mercury Marine disregards the pre and post-shift punches within the grace periods, unless an employee's supervisor has authorized an employee to work during one of the grace periods. If this occurs, the supervisor edits the employee's timecard to reflect that he or she worked during the time period and ensures the employee is compensated for all time worked. This practice is unquestionably permissible under the FLSA's governing regulations and Robles presents no evidence to the contrary.

Mercury Marine's Work Rules also expressly prohibit the purported class members from working unscheduled overtime or otherwise outside of their scheduled shift unless such time is assigned by their supervisor and they are therefore compensated for it. As demonstrated by the more than 50 declarations filed herewith, including from purported class members, their union leadership, and Mercury Marine's supervisors and Human Resources Department, employees universally understand that Mercury Marine prohibits employees from working during the grace periods and there is absolutely no expectation that they do so. The idea that Mercury Marine, in a unionized setting, has somehow "fostered a culture" of allowing employees to work and not get compensated for their time is simply absurd.

To the extent a few purported class members violated the Company's Work Rules by working during their grace periods without supervisor authorization, they did so *for their own convenience*, and furthermore, their claims are far too distinct and individualized to warrant class and collective treatment. As noted above, Plaintiff's proposed class would include well over 3,500 current and former Mercury Marine employees, working in different jobs, different facilities, different shifts and thus with widely varying job duties and work environments. Indeed, the proposed class covers 8 different facilities, across 9 potential shift patterns, with

markedly different work requirements, scheduling practices, and shift start procedures. Whether, and to what extent, any employee is owed potential compensation for work outside the shift will depend on a wide range of unique factors, including but not limited to their job, department, group lead, supervisor, shift, arrival time and exit time (among others). Claims like this, which turn on highly individualized inquiries, are inappropriate for collective or class treatment. For these reasons, and for those explained in greater detail below, Plaintiff's motion for conditional certification should be denied.

## FACTS

### A. Mercury Marine And Its Fond Du Lac Campus

Mercury Marine, a division of Brunswick Corporation, is the global marine leader in propulsion systems and services, integrated electronics, and parts and accessories. (Dkt. # 28-1 (Deposition of James Gardiner ("Gardiner Dep.") at p. 24)). The Company is the largest builder of marine propulsion systems in the world, with over 5,200 employees and manufacturing facilities in the United States, Mexico, Japan, and China. The Company's global headquarters, and largest manufacturing campus, is in Fond du Lac, Wisconsin. (Gardiner Dep at pp. 24-25.)

As of May 1, 2019, there were approximately 2,176 production and maintenance employees working at Mercury Marine's Fond du Lac campus. (*Id.* at p. 28.) Those employees work across eight different facilities, which include: Plants 3, 4, 15, 17, 98, 15L/95, and 15S, and the Dixie Street storage facility. (*Id.* at p. 25.) The work performed at each facility, and the approximate number of purported class members who work at each, is as follows:

- *Plant 3*: Parts and accessories warehousing (number of purported class members: 191);
- *Plant 4*: Steel machining, gears and shafts manufacturing, heat treat operation (number of purported class members: 262);

3

- *Plant 15*: Assembly, coating, and aluminum machining operations (number of purported class members: 1,169);

- *Plant 17*: Foundry and die cast operations (number of purported class members: 348);

- *Plant 98*: Propeller creation and investment casting (number of purported class members: 70);

- *Plant 15L/95*: Finished goods distribution warehousing and material receipt (number of purported class members: 98);

- *Plant 15S*: Remanufacturing operations (number of purported class members: 32); and

- *Dixie Street Storage Facility*: Die cast and foundry tool storage (number of purported class members: 3)

The number of shifts and work schedules vary significantly across the facilities that make up Mercury Marine's Fond du Lac campus. (Gardiner Dep. at p. 43.) For example, there are different shift patterns that employees work, including eight, nine (with a four hour Friday shift), ten, and twelve-hour shifts depending on the department and facility in which the employee is assigned. (Gardiner Dep. at p. 43.) Further, many departments, including those in Assembly (Plant 15), Die Cast (Plant 17), and maintenance have scheduled overlap between shifts so that employees within those departments can have turnover discussions regarding what occurred on the prior shift while both employees are on the clock and/or to ensure continuous production while the newly arriving shift is stretching. (Gardiner Dep. at p. 146.) These scheduling practices and shift patterns vary greatly from facility to facility, and department to department, depending on the nature of the work and the preferences of the supervisors and plant managers who are responsible for scheduling. (*Id.*)

**B. Mercury Marine and IAM Local 1947**

Essentially all of the purported class members working at Mercury's Fond du Lac Campus — with the exception of a very small number (i.e., less than 12) — are members of the International Association of Machinists Union, Local 1947 ("the union"). (*Id.* at pp. 27-28.)

4

Pursuant to the CBA between Mercury Marine and the union, the purported class members are put into different job classifications (such as I, II, III, and line leader) with numerous different job titles and different responsibilities. (Declaration of James Gardiner ("Gardiner Decl.") at ¶ 3; (Declaration of Steven Kruzel ("Kruzel Decl."), at ¶ 2 Ex. A.) These jobs differ greatly — ranging from Machinist Technician to Die Cast Supertech, and Paint Technician I and Assembly Tech Line Leader. (Gardiner Decl. at ¶ 3.) They require different levels of skill, have greatly different responsibilities, and, as noted above, operate on different schedules. (*Id.* at ¶ 4.)

As reflected in Mercury Marine and the union's CBA, the Company's compensation policies and procedures require that hourly employees are paid for all of the time they are scheduled to work. (*Id.* at ¶ 5.) Notably, the Company has agreed to pay for time when employees are not working, as noted in Section 5.8, entitled "Wash-Up Periods," which provides that: "Employees shall be permitted to stop work on Company time five (5) minutes before the eating period and five (5) minutes before the end of each shift to wash up." (*Id.* at ¶ 6.) The Company has also agreed to pay employees at double time for all hours worked in excess of 12 hours on a single day, and for all work performed on Sundy or a "holiday" as designated under the contract. (*Id.* at ¶ 7.) Additionally, for Fifth and Sixth Shift, the Company has agreed to pay the purported class members at double time for all hours worked in excess of 48 hours in one seven day work week, and time and one-half for all hours worked in excess of thirty-six hours in one seven day work week. (*Id.* at ¶ 8.) Thus, through the CBA, the Company has agreed as its customary practice to pay *both* regular wages and overtime to the purported class members in a manner that is more generous than required under the FLSA or Wisconsin law. (29 U.S.C. § 207(a)(1); DWD 274.03.)

### C. Mercury Marine's Work Rules

Mercury Marine maintains Work Rules for its Fond du Lac Campus which, among other things, expressly prohibit employees from working unauthorized overtime or otherwise outside of their scheduled hours. (Gardiner Dep. at pp. 67-68, 71.) These Work Rules are posted in Mercury Marine's facilities and distributed to (and explained to) employees during their general orientation by Mercury Marine's Human Resources Department, and by their individual supervisor during their position-specific training. (Gardiner Dep. at pp. 67-68, 71.)

Both the union's senior leadership (i.e., the local president, vice president, coordinator, and plant chairmen) and the purported class members clearly understand these rules and the prohibition against working outside of a scheduled shift without supervisor authorization. Indeed, both the union's senior leadership and other purported class members — who represent a diverse and representative sample working in different facilities and on different shifts — uniformly express that hourly employees: (1) do not work outside their shift times without authorization (and therefore without being compensated); (2) based on their observations, other union employees do not work outside their scheduled shifts without authorization (and therefore without being compensated); and (3) if union employees were working during the grace periods and not being compensated for such time, the union would address the issue with Mercury Marine's Human Resources Department, and potentially file a grievance regarding the issue. No grievance has been filed because employees are aware of and are following the Work Rules by not working during the pre and post-shift periods without authorization and without being compensated for their time. (Declaration of Paul Walker ("Walker Decl.") at ¶¶ 1-9); (Declaration of Allen Morin ("Morin Decl.") at ¶¶ 1-9); (Declaration of Jonathan Beahm ("Beahm Decl.") at ¶¶ 1-9); (Declaration of Justin Bader ("Bader Decl.") at ¶¶ 1-9); (Declaration

of Thomas Weeks ("Weeks Decl.") at ¶¶ 1-9); (Declaration of Terry Ellis ("Ellis Decl.") at ¶¶ 1-9); (Declaration of Melissa Matthias ("Matthias Decl.") at ¶¶ 1-6); (Declaration of Jody Christensen ("Christensen Decl.") at ¶¶ 1-6); (Declaration of Charles Moore ("Moore Decl.") at ¶¶ 1-6); (Declaration of Donald Craig ("Craig Decl.") at ¶¶ 1-6); Declaration of Shawn Yanke ("Yanke Decl.") at ¶¶ 1-6); (Declaration of Nathan Will ("Will Decl.") at ¶¶ 1-6); (Declaration of Jeffery Thomas ("Thomas Decl.") at ¶¶ 1-6); (Declaration of Scott Sommers ("Sommers Decl.") at ¶¶ 1-6); (Declaration of Roque Schneider ("Schneider Decl.") at ¶¶ 1-6); (Declaration of Travis Roseler ("Roseler Decl.") at ¶¶ 1-6); (Declaration of Juan Pleitez Chavez ("Chavez Decl.") at ¶¶ 1-6); (Declaration of Timothy Peters ("Peters Decl.") at ¶¶ 1-6); (Declaration of Margaret Lucek ("Lucek Decl.") at ¶¶ 1-6); (Declaration of Dawn Kuether ("Kuether Decl.") at ¶¶ 1-6); (Declaration of Glen Karls ("Karls Decl.") at ¶¶ 1-6); (Declaration of Tammi Kalebic ("Kalebic Decl.") at ¶¶ 1-6); (Declaration of Zachery Higginbotham ("Higginbotham Decl.") at ¶¶ 1-6); (Declaration of John Eggers ("Eggers Decl.") at ¶¶ 1-6); (Declaration of Thomas Cooper ("Cooper Decl.") at ¶¶ 1-6); (Declaration of Jason Wichmann ("Wichmann Decl.") at ¶¶ 1-6).

Further, in the few instances when Mercury Marine learns that employees are working outside of their scheduled shift, and performing unauthorized work or overtime, the Company consistently enforces its Work Rules and disciplines employees for engaging in such behavior. (Gardiner Dep. Tr. 233.)  In particular, the Company has disciplined bargaining unit employees for performing unauthorized work throughout 2011- 2018.  (Gardiner Tr. 139; Dkt. ## 28-8 - 28-13.)  Supervisory employees — in conjunction with the union's most senior leadership — have also counseled purported class members for specifically performing unauthorized work during the Company's grace periods.  (Declaration of Michael Toshner ("Toshner Decl.") at ¶ 5);

(Declaration of Alexander Neubauer ("Neubauer Decl.") at ¶ 5); (Declaration of Aaron Fellenz

("Fellenz Decl.") at ¶ 5); and (Declaration of Robert Tank ("Tank Decl.") at ¶ 5).

### D. The Fond du Lac Campus' Kronos Conventions

During their employment at Mercury Marine, all of the purported class members utilize a

timekeeping system called "Kronos." (Gardiner Dep. at p. 66.) Employees punch in and out by

scanning their employee ID badge at any Kronos time clock throughout the facility, which

flashes a green light to show that a punch has been accepted, and which shows their schedule if

they select to look at it. (*Id.* at p. 67.) Members from Mercury Marine's Human Resources

Department provide all purported class members a training session on Kronos as part of their

new hire orientation. (*Id.* at pp. 67-69.) Additionally, supervisors provide individualized

training for employees within their department, where among other topics, they address punch-in

and time clock procedures and expectations. (*Id.* at pp. 86-88.)

For their convenience and to prevent substantial employee lines at its time clocks, the

Company permits the purported class members to punch into Kronos no more than 29 minutes

before the start of their shift, and to punch out of Kronos no more than 14 minutes after the end

of the shift. (Gardiner Dep. at pp. 100-05.) The Plaintiff is correct that the Kronos Software

utilized by the Company contains a "grace period" function as well as a change point rounding

function. (Dkt. #29, at pp. 6-7.) The Fond du Lac Campus' pre shift and post conventions are

built into the change point rounding function for the purpose of "allow[ing] for employees who

arrive early to punch in before their shift while they wait to begin work and for the queue at the

end of the day to clear . . ." (Gardiner Dep. at pp. 99-100; Dkt. 28-6 (Gardiner Dep. Ex. 9).)

And it is evident why the Fond du Lac Campus' Kronos conventions are established in

this manner and for this purpose — the Fond du Lac Campus is expansive and hundreds of

8

employees may be working a given shift.  For example, Plant 15 is approximately 1.1 million square feet and approximately 500 employees work on the first shift there.  (Gardiner Decl. at ¶ 2.)  The 29/14 minute grace periods set limits on employees' time in the facilities when they are not working, while still giving them to settle in, drop off or collect personal belongings or clothing, go to the bathroom or breakroom, read the paper, have coffee, listen to music or utilize their phones, smoke, and socialize with co-workers (among other personal tasks they may wish to do).  (Matthias Decl. at ¶¶ 2-3); (Christensen Decl. at ¶¶ 2-3); (Moore Decl. at ¶¶ 2-3); (Craig Decl. at ¶¶ 2-3); (Yanke Decl. at ¶¶ 2-3); (Will Decl. at ¶¶ 2-3); (Thomas Decl. at ¶¶ 2-3); (Sommers Decl. at ¶¶ 2-3); (Schneider Decl. at ¶¶ 2-3); (Roseler Decl. at ¶¶ 2-3); (Chavez Decl. at ¶¶ 2-3); (Peters Decl. at ¶¶ 2-3); (Lucek Decl. at ¶¶ 2-3); (Kuether Decl. at ¶¶ 2-3); (Karls Decl. at ¶¶ 2-3); (Kalebic Decl. at ¶¶ 2-3); (Higginbotham Decl. at ¶¶ 2-3); (Eggers Decl. at ¶¶ 2-3); (Cooper Decl. at ¶¶ 2-3); and (Wichmann Decl. at ¶¶ 2-3).  The pre-shift/post-shift windows also provide flexibility for unpredictable commutes, especially for employees who travel significant distances to and from work each day.  (Gardiner Decl. at ¶ 9.)  It also allows employees who like to park close to the facility's entrance arrive to work early and obtain preferred parking spots close to the entrance of the facility.  (*Id.*)  The union agrees with this practice given the benefits and convenience it provides its members.  And both the Company and the union (including its most senior leaders) expect that employees do not work outside their scheduled shift (including during the grace periods) unless they have been authorized to do so by their supervisors and are therefore being compensated for their time.  (Toshner Decl. at ¶¶ 3, 5); (Neubauer Decl. at ¶¶ 3, 5); (Fellenz Decl. at ¶¶ 3, 5); (Tank Decl. at ¶¶ 3, 5); (Declaration of Jeffery Whiting ("Whiting Decl.") at ¶¶ 3, 5); (Declaration of Robert Aldrete ("Aldrete Decl.") at ¶¶ 3, 5); (Declaration of Randy Willis ("Willis Decl.") at ¶¶ 3, 5); (Declaration of Raymond Jolin

("Jolin Decl.") at ¶¶ 3, 5); (Declaration of Jess Fraser ("Fraser Decl.") at ¶¶ 3, 5); (Declaration of James Kroeger ("Kroeger Decl.") at ¶¶ 3, 5); (Declaration of Steve Wilson ("Wilson Decl.") at ¶¶ 3, 5); (Declaration of Scott Nowland ("Nowland Decl.") at ¶¶ 3, 5); (Declaration of David Olson ("Olson Decl.") at ¶¶ 3, 5); (Declaration of Ronald Shultz ("Schultz Decl.") at ¶¶ 3, 5); (Declaration of Nickolas Wirkus ("Wirkus Decl.") at ¶¶ 3, 5); (Declaration of Steven Wyrobeck ("Wyrobeck Decl.") at ¶¶ 3, 5); (Declaration of Carey Slater ("Slater Decl.") at ¶¶ 3, 5); (Declaration of Eric Gerlach ("Gerlach Decl.") at ¶¶ 3, 5); (Declaration of David Disterhaft ("Disterhaft Decl.") at ¶¶ 3, 5); (Declaration of Joshua Newton ("Newton Decl.") at ¶¶ 3, 5); (Declaration of Jerred Nelson ("Nelson Decl.") at ¶¶ 3, 5); (Declaration of Timothy Pickart ("Pickart Decl.") at ¶¶ 3, 5); (Declaration of Timothy Garriety ("Garriety Decl.") at ¶¶ 3, 5); (Declaration of Lawrence Rising ("Rising Decl.") at ¶¶ 3, 5); (Declaration of Eric Gerlach ("Gerlach Decl.") at ¶¶ 3, 5); (Declaration of Chad Weber ("Weber Decl.") at ¶¶ 3, 5); (Declaration of Kevin Manecke ("Manecke Decl.") at ¶¶ 3, 5); (Declaration of Eli Gustafson ("Gustafson Decl.") at ¶¶ 3, 5); (Walker Decl. at ¶ 3); (Morin Decl. at ¶ 3); (Beahm Decl. at ¶ 3); (Bader Decl. at ¶ 3); (Weeks Decl. at ¶ 3); and (Ellis Decl. at ¶ 3).

In this regard, production demands sometimes require union employees to work outside their scheduled shift; for example, supervisors have asked employees to stay after the end of their scheduled shift (or to come in before their scheduled shift) to complete time-sensitive shipping tasks, to maximize production in a specific work cell, or to finish a particular project. (Disterhaft Decl. at ¶ 5); (Nelson Decl. at ¶ 5); and (Aldrete Decl. at ¶ 5). In these instances, the employees' Kronos schedule is always adjusted so he/she is paid for the additional time spent working. (*Id.*) The purported class members know that their time is adjusted to pay for any work outside their shift. Indeed, opt-in Plaintiff David Hall ("Hall") testified that there have been occasions where

QB\58554514.4

he was asked to come in early and work before shift started. (Kruzel Decl. at ¶ 4, Exhibit C, Deposition of David Hall ("Hall Dep.") at pp. 19-20). On those occasions, he talked to his supervisor, ensured the time was approved, and was compensated for his time. (*Id.*). And numerous purported class members confirm the same experience is true for them. (Matthias Decl. at ¶ 4); (Christensen Decl. at ¶ 4); (Moore Decl. at ¶ 4); (Craig Decl. at ¶ 4); (Yanke Decl. at ¶ 4); (Will Decl. at ¶ 4); (Thomas Decl. at ¶ 4); (Sommers Decl. at ¶ 4); (Schneider Decl. at ¶ 4); (Roseler Decl. at ¶ 4); (Chavez Decl. at ¶ 4); (Peters Decl. at ¶ 4); (Lucek Decl. at ¶ 4); (Kuether Decl. at ¶ 4); (Karls Decl. at ¶ 4); (Kalebic Decl. at ¶ 4); (Higginbotham Decl. at ¶ 4); (Eggers Decl. at ¶ 4); and (Cooper Decl. at ¶ 4).

During the Company's onboarding training, representatives from Mercury Marine's Human Resources Department cover punch-in and punch-out procedures at the Fond du Lac campus. (Declaration of Joshua Ingram ("Ingram Decl.") at ¶ 3); (Declaration of Amy Payne ("Payne Decl.") at ¶ 3); (Declaration of Dixie Kraege ("Kraege Decl.") at ¶ 3); and (Declaration of Emily Mashak ("Mashak Decl.") at ¶ 3). In particular, during this portion of the training they explain to employees the Company's pre-shift and post-shift grace periods, specifically, that for their convenience they are able to punch into Kronos no more than 29 minutes before the start of their shift and to punch out of Kronos no more than 14 minutes after the end of the shift. (*Id.*) They further explain to employees that they are only required to be at their workstation, ready to begin work, at the start of their shift. (*Id.*) Employees are *not* instructed that they should begin working immediately after punching in or otherwise during the pre-shift and post-shift grace periods. (Ingram Decl. at ¶ 4); (Payne Decl. at ¶ 4); (Kraege Decl. at ¶ 4); (Mashak Decl. at ¶ 4).

QB\58554514.4

### E. Pre-Shift And Post-Shift Practices At The Fond du Lac Campus

Supervisors are at work during the times before and after the purported class members' shifts. (Gardiner Decl. at ¶ 10.) Among other things, Mercury Marine's supervisors are able to monitor union employees' pre and post shift activities and, if needed, enforce Mercury Marine's prohibition on unscheduled overtime and ensure that purported class members are not performing unauthorized work. (Toshner Decl. at ¶ 5); (Neubauer Decl. at ¶ 5); (Fellenz Decl. at ¶ 5); (Tank Decl. at ¶ 5); (Whiting Decl. at ¶ 5); (Aldrete Decl. at ¶ 5); (Willis Decl. at ¶ 5); (Jolin Decl. at ¶ 5); (Fraser Decl. at ¶ 5); (Kroeger Decl. at ¶ 5); (Wilson Decl. at ¶ 5); (Nowland Decl. at ¶ 5); (Olson Decl. at ¶ 5); (Schultz Decl. at ¶ 5); (Wirkus Decl. at ¶ 5); (Wyrobeck Decl. at ¶ 5); (Slater Decl. at ¶ 5); (Gerlach Decl. at ¶ 5); (Disterhaft Decl. at ¶ 5); (Newton Decl. at ¶ 5); (Nelson Decl. at ¶ 5); (Pickart Decl. at ¶ 5); (Garriety Decl. at ¶ 5); (Rising Decl. at ¶ 5); (Weber Decl. at ¶ 5); (Manecke Decl. at ¶ 5); and (Gustafson Decl. at ¶ 5).

As would be expected given the flexibility provided to employees under the Fond du Lac campus' clock-in and clock-out procedures, supervisors and employees see significant variation in employee arrival time and when employees punch into Kronos for the day. (Whiting Decl. at ¶¶ 6-7); (Aldrete Decl. at ¶¶ 6-7); (Toshner Decl. at ¶¶ 6-7); (Jolin Decl. at ¶¶ 6-7); (Fraser Decl. at ¶¶ 6-7); (Kroeger Decl. at ¶¶ 6-7); (Olson Decl. at ¶¶ 6-7); (Schultz Decl. at ¶¶ 6-7); (Neubauer Decl. at ¶¶ 6-7); (Newton Decl. at ¶¶ 6-7) (Tank Decl. at ¶¶ 6-7) (Slater Decl. at ¶¶ 6-7); (Gerlach Decl. at ¶ 5); (Pickart Decl. at ¶¶ 6-7); (Garriety Decl. at ¶¶ 6-7); (Rising Decl. at ¶¶ 6-7); (Weber Decl. at ¶¶ 6-7); (Manecke Decl. at ¶¶ 6-7) (Gustafson Decl. at ¶¶ 6-7); (Matthias Decl. at ¶ 3); (Christensen Decl. at ¶ 3); (Moore Decl. at ¶ 3); (Craig Decl. at ¶ 3); (Yanke Decl. at ¶ 3); (Will Decl. at ¶ 3); (Thomas Decl. at ¶ 3); (Sommers Decl. at ¶ 3); (Schneider Decl. at ¶ 3); (Roseler Decl. at ¶ 3); (Chavez Decl. at ¶ 3); (Peters Decl. at ¶ 3); (Lucek Decl. at ¶ 3);

QB\58554514.4

(Kuether Decl. at ¶ 3); (Karls Decl. at ¶ 3); (Kalebic Decl. at ¶ 3); (Higginbotham Decl. at ¶ 3);

(Eggers Decl. at ¶ 3); (Cooper Decl. at ¶ 3); and (Wichmann Decl. at ¶ 3). For example, some

employees like to get to Mercury Marine early and punch in near the beginning of the grace

period, while other employees punch in at the last minute before the start of their shift — both of

which (and any option in between) are permitted under Mercury Marine's Work Rules and the

CBA so long as employees are at their work station at the start of their scheduled shift. (*Id.*)

Indeed, Robles typically punched in less than five minutes prior to her start time, and punched in

on her actual start time on numerous occasions during her short tenure (only a few months in

2016) at Mercury Marine. (Kruzel Decl. at ¶ 3 Exhibit B.) Further, as noted above, employees

who punch in before the start of their shift are not performing work, but rather are free to (and

do) engage in generally any personal task they so choose. (Matthias Decl. at ¶¶ 2-3);

(Christensen Decl. at ¶¶ 2-3); (Moore Decl. at ¶¶ 2-3); (Craig Decl. at ¶¶ 2-3); (Yanke Decl. at ¶¶

2-3); (Will Decl. at ¶¶ 2-3); (Thomas Decl. at ¶¶ 2-3); (Sommers Decl. at ¶¶ 2-3); (Schneider

Decl. at ¶¶ 2-3); (Roseler Decl. at ¶¶ 2-3); (Chavez Decl. at ¶¶ 2-3); (Peters Decl. at ¶¶ 2-3);

(Lucek Decl. at ¶¶ 2-3); (Kuether Decl. at ¶¶ 2-3); (Karls Decl. at ¶¶ 2-3); (Kalebic Decl. at ¶¶ 2-

3); (Higginbotham Decl. at ¶¶ 2-3); (Eggers Decl. at ¶¶ 2-3); (Cooper Decl. at ¶¶ 2-3);

(Wichmann Decl. at ¶¶ 2-3); (Walker Decl. at ¶ 3); (Morin Decl. ¶ 3); (Beahm Decl. at ¶ 3);

(Bader Decl. at ¶ 3); (Weeks Decl. at ¶ 3); (Ellis Decl. at ¶ 3); (Toshner Decl. at ¶ 7); (Neubauer

Decl. at ¶ 7); (Fellenz Decl. at ¶ 6); (Tank Decl. at ¶ 7); (Whiting Decl. at ¶ 7); (Aldrete Decl. at

¶ 7); (Willis Decl. at ¶ 6); (Jolin Decl. at ¶ 7); (Fraser Decl. at ¶ 7); (Kroeger Decl. at ¶ 7);

(Wilson Decl. at ¶ 6); (Nowland Decl. at ¶ 6); (Olson Decl. at ¶ 7); (Schultz Decl. at ¶ 7);

(Wirkus Decl. at ¶ 6); (Wyrobeck Decl. at ¶ 6); (Slater Decl. at ¶ 7); (Gerlach Decl. at ¶ 7);

(Disterhaft Decl. at ¶ 6); (Newton Decl. at ¶ 7); (Nelson Decl. at ¶ 6); (Pickart Decl. at ¶ 7);

(Garriety Decl. at ¶ 7); (Rising Decl. at ¶ 7); (Weber Decl. at ¶ 7); (Manecke Decl. at ¶ 7); and (Gustafson Decl. at ¶ 7).

And employees are not working past the end of their shift. (Robles Dep. at p. 100.) Indeed, as reflected above, under the CBA they are allowed to (and do) stop working 5 minutes prior to their shift end and wash-up on Company time while getting paid. (Gardiner Dep. at pp. 124-25.) They then have time to get in line at the time clock and punch out close to — if not immediately at — the end of their shift. Indeed, as reflected in Robles' time records and in her deposition testimony, she did not perform post-shift work, punched out immediately at her shift end on every single occasion she worked at Mercury except for three shifts (and, in two of those, she punched out a minute after her shift end). (Robles Dep. at p. 100-01; Kruzel Decl. Ex. B.) Moreover, the purported class members, their union representatives, and Mercury Marine's supervisors all uniformly confirm that purported class members stop working immediately at or before the end of the shift, wash-up and leave the facility unless authorized to continue working after their shift. (Matthias Decl. at ¶ 4); (Christensen Decl. at ¶ 4); (Moore Decl. at ¶ 4); (Craig Decl. at ¶ 4); (Yanke Decl. at ¶ 4); (Will Decl. at ¶ 4); (Thomas Decl. at ¶ 4); (Sommers Decl. at ¶ 4); (Schneider Decl. at ¶ 4); (Roseler Decl. at ¶ 4); (Chavez Decl. at ¶ 4); (Peters Decl. at ¶ 4); (Lucek Decl. at ¶ 4); (Kuether Decl. at ¶ 4); (Karls Decl. at ¶ 4); (Kalebic Decl. at ¶ 4); (Higginbotham Decl. at ¶ 4); (Eggers Decl. at ¶ 4); (Cooper Decl. at ¶ 4); (Wichmann Decl. at ¶ 4); (Walker Decl. at ¶ 6); (Morin Decl. ¶ 6); (Beahm Decl. at ¶ 6); (Bader Decl. at ¶ 6); (Weeks Decl. at ¶ 6); and (Ellis Decl. at ¶ 6).

### F. Mercury Marine's Safeguards Against Pre/Post-Shift Work

Mercury Marine has instituted numerous safeguards to ensure that the purported class members are not performing unauthorized work during the pre-shift and post-shift grace periods.

14

For one, the Company makes it explicitly clear when an employee's shift starts and ends. Specifically, in each of the facilities at the Fond du Lac campus, two bells sound to signal the start of a shift — one bell rings 5 minutes prior to alert employees that the shift starts in 5 minutes, and a second bell rings at the shift start. (Gardiner Dep. at p. 157.) Depending on the employees' department, employees then participate in stretching, attend a start of shift huddle meeting with the rest of their co-workers in their department, or if they are on a scheduled overlap, participate in turnover discussions with the employee they are relieving. (Gardiner Dep. at pp. 146-48.) Similarly, at the end of a shift, two bells ring signaling employees to stop work. (Gardiner Dep. at p. 147.) Specifically, a bell rings five minutes prior to shift end informing employees to stop working and to wash-up. (Gardiner Dep. at pp. 124-25.) Employees no longer are required or expected to work and are able to wash up while on Company time. (*Id.*) A second bell rings at the shift end and employees regularly clock-out the minute their shift ends. (*Id.*)

There are also multiple platforms — both through the Company and the Union — for employees to raise any questions or concerns regarding their schedules, hours worked and/or compensation. (Gardiner Dep. at p. 212.) For one, employees are encouraged (and instructed) to speak with their supervisors (or their supervisors' manager) regarding any concerns or questions they have regarding their schedules or compensation. (Gardiner Dep. at p. 212); (Toshner Decl. at ¶¶ 3, 5); (Neubauer Decl. at ¶¶ 3, 5); (Fellenz Decl. at ¶¶ 3, 5); (Tank Decl. at ¶¶ 3, 5); (Whiting Decl. at ¶¶ 3, 5); (Aldrete Decl. at ¶¶ 3, 5); (Willis Decl. at ¶¶ 3, 5); (Jolin Decl. at ¶¶ 3, 5); (Fraser Decl. at ¶¶ 3, 5); (Kroeger Decl. at ¶¶ 3, 5); (Wilson Decl. at ¶¶ 3, 5); (Nowland Decl. at ¶¶ 3, 5); (Olson Decl. at ¶¶ 3, 5); (Schultz Decl. at ¶¶ 3, 5); (Wirkus Decl. at ¶¶ 3, 5); (Wyrobeck Decl. at ¶¶ 3, 5); (Slater Decl. at ¶¶ 3, 5); (Gerlach Decl. at ¶¶ 3, 5); (Disterhaft Decl.

at ¶¶ 3, 5); (Newton Decl. at ¶¶ 3, 5); (Nelson Decl. at ¶¶ 3, 5); (Pickart Decl. at ¶¶ 3, 5); (Garriety Decl. at ¶¶ 3, 5); (Rising Decl. at ¶¶ 3, 5); (Weber Decl. at ¶¶ 3, 5); (Manecke Decl. at ¶¶ 3, 5); and (Gustafson Decl. ¶¶ 3, 5). Employees are not shy to report potential compensation-related issues and regularly monitor their paychecks and discuss them with Human Resources if they have questions or concerns related to their compensation. (Gardiner Decl. at ¶ 11.) Additionally, the purported class members are able to speak to their union stewards and/or other union leaders (including the union's senior leadership team) regarding any issues with respect to the terms and conditions of their employment. (Gardiner Dep. at p. 212); (Walker Decl. at ¶¶ 2, 8-9); (Morin Decl. at ¶¶ 2, 8-9); (Beahm Decl. at ¶¶ 2, 8-9); (Bader Decl. at ¶¶ 2, 8-9); (Weeks Decl. at ¶¶ 2, 8-9); and (Ellis Decl. at ¶¶ 2, 8-9).

The Fond du Lac Human Resources Department and union leadership are in regular communication, and union leaders frequently discuss employee-related issues with the Human Resources Department. If an issue related to compensation or scheduling cannot be resolved through a conversation, the union can (and does) pursue grievances related to such an issue. (Gardiner Dep. at p. 212); (Walker Decl. at ¶ 9); (Morin Decl. at ¶ 9); (Beahm Decl. at ¶ 9); (Bader Decl. at ¶ 9); (Weeks Decl. at ¶ 9); and (Ellis Decl. at ¶ 9). Tellingly, the union — verified by its most senior leadership — has *never* filed a grievance related to the claims raised by Robles and the few remaining opt-in Plaintiffs. (Walker Decl. at ¶ 8); (Morin Decl. at ¶ 8); (Beahm Decl. at ¶ 8); (Bader Decl. at ¶ 8); (Weeks Decl. at ¶ 8); and (Ellis Decl. at ¶ 8). If employees are for some reason uncomfortable reporting the issue to their supervisor/manager or union leadership, they are also able to anonymously report any issue to Brunswick's Ethics Hotline. (Gardiner Dep. at p. 213.) Mercury Marine Human Resources leadership is unaware of any ethics complaints ever having been raised regarding the allegations in this lawsuit. (*Id.*)

QB\58554514.4

### G. Discovery Conducted By The Parties To Date

Robles' motion repeatedly relies on the fact that the Parties have engaged in "very limited discovery" as a justification that this Court grant conditional certification. (Dkt. #29, at pp. 14, 17, 18, and 19). While Robles is correct that significant discovery has not yet been completed, this should not be used to her benefit because the majority of the opt-in Plaintiffs have dropped out of the lawsuit instead of responding to discovery requests. Specifically, the parties had agreed that prior to conditional certification briefing Mercury could seek limited discovery from 5 opt-in plaintiffs. (Kruzel Decl. at ¶ 5.) Mercury served this discovery and it received responses from only two individuals. (*Id.*) Two individuals opted-out in lieu of responding, and Plaintiffs' counsel filed a withdrawal of representation for another opt-in due to their decision to limit the scope of the proposed class. (Dkts. ### 21-1, 21-2, and 32.)

The parties then agreed to substitute new opt-in plaintiffs for discovery. Following the court's June 27, 2019, order, Mercury Marine deposed Hall. Three other opt-ins refused to respond to the limited discovery requests and Plaintiffs' counsel had to file a withdrawal of representation for them as well. (Dkt. #37.) In total, 6 opt-ins (of the 13 that once existed) have already dropped out based on the request that they simply respond to 5 requests for production and 5 interrogatories. Thus, while discovery has been limited, this has been caused in large part due to the opt-in Plaintiffs' refusal to respond to Mercury's more than reasonable discovery requests and should not be a basis that supports conditional certification.

Further, the limited discovery the Company has been able to complete demonstrates that the Plaintiff's claims are meritless and that they do not warrant collective or class treatment. For example, opt-in Hall — the only opt-in the Company was able to depose — admitted in his deposition that he was never required to perform work during the pre-shift or post-shift grace

QB\58554514.4

periods, that he understood he would only be paid from his shift start time until his shift end time unless his supervisor approved him to work outside of his scheduled shift, and that, at his own choosing, he would sometimes start prep work during the grace period because "it makes the day a lot smoother" and its "definitely" easier for him when chose to do so. (Hall Dep. at pp. 31-32, 51.) Hall also admitted that while he worked in the Assembly Department, there was really no opportunity for employees in the department to complete any pre-shift work and he therefore did not complete any work outside of his scheduled shift during that time period. (Hall Dep. at pp. 41-42.) He also acknowledged the various supervisory practices and significant discretion supervisors have at Mercury Marine, explaining that while he worked on first shift there was more flexibility, and he would inform his supervisor that he was going to begin work early and that his supervisor would authorize him to do so and alter his time card to reflect the additional time. (Hall Dep. Tr. at pp. 29-30.) He stated that on the fifth shift such practices were not allowed and he did not perform any work outside of his scheduled shift. (*Id*.)

Hall also contradicted the declaration Plaintiff relies on in support of her motion for conditional certification, admitting (among other things) that, despite what his declaration said, he *knew* that he would not be compensated for any work allegedly performed during the pre-shift grace periods unless it was authorized by a supervisor, he knew that he could inform his supervisors of work performed outside of his shift (and did so on numerous occasions), and that he had been compensated for such time when his supervisors approved him working outside of his shift. (*Id.* at 54-55.)

Robles' deposition was much of the same. She admitted that, contrary to the allegations in her complaint, she never performed work after her shift, she has no knowledge of other employees performing work after their shifts, and that, in instances where she swiped in less than

10 minutes prior to her shift start (which was essentially all of her shifts) she could not recall whether she allegedly performed any work during the pre-shift grace periods. (Robles Dep. Tr. at pp. 58, 100). She also admitted that she had no basis for many of the allegations in her complaint, including her claim that early out punches were always rounded in the Company's favor, and that that late punches were rounded in the Company's favor. (Robles Dep. at pp. 82-84.) Presumably this is why Plaintiffs' brief in support of its motion for conditional certification does not rely on a single piece of testimony from Robles. (*See* Dkt. 29.)

## ARGUMENT

### I. LEGAL STANDARD

As noted above, Robles has requested that the Court conditionally certify a class of more *than 3,500* current and former Mercury Marine employees based on the declarations *of three individuals* — only one of whom Mercury was able to depose actually rescinded many of the key allegation therein — and without a single citation to testimony from her throughout the entirety of her brief. Section 216(b) of the FLSA authorizes employees to bring collective actions to recover unpaid overtime compensation on behalf of themselves and "other employees similarly situated." 29 U.S.C. § 216(b). To do so, the court must determine whether the named Plaintiffs have made a "modest factual showing" that they and potential class members were victims of a common policy or plan that violated the law. *See Bitner v. Wyndham Vacation Resorts, Inc.*, 301 F.R.D. 354, 357 (W.D. Wis. 2014). "The critical inquiry in determining whether a Court should exercise its discretion to authorize the sending of notice to potential Plaintiffs is whether the representative Plaintiff has shown that she is similarly situated to the potential class Plaintiffs." *Austin v. Cuna Mut., Ins. Cos.,* 232 F.R.D. 601, 605 (W.D. Wis. 2006).

Where some discovery has been conducted, it is appropriate for the Court to apply a higher level of review. *See Boelk v. AT&T Telaholdings, Inc.*, 2013 WL 261265, at \*14 (W.D.

QB\58554514.4

Wis. January 10, 2013) (applying a higher level of review where the parties had exchanged written discovery and where the named plaintiffs and corporate representative had been deposed); *Hawkins v. Alorica, Inc.*, 287 F.R.D. 431 (S.D. Ind. Sept. 25, 2012) (appropriate to apply more scrutiny to plaintiffs' claim at conditional certification stage where discovery has been done but was not yet complete).  In assessing plaintiffs' claims regarding similarity, courts in the Seventh Circuit have repeatedly noted they are not required to accept the Plaintiffs' allegations as true and will consider contrary evidence.  *See, e.g., Martinez v. Regency Janitorial Services, Inc.*, 2012 WL 252230 at *1 (E.D. Wis. Jan. 26, 2012) ("While the Court need not resolve substantive merits of the Plaintiffs' claim at this preliminary stage, the Court is not required to accept the Plaintiffs' allegations as true."); *Howard v. Securitas Sec. Servs.*, U.S., 2009 WL 140126 (N.D. Ill. Jan. 20, 2009) ("In making a determination as to similarity, the Court need not accept the Plaintiffs' allegations as true as it would with a motion to dismiss.").

Notably, and despite Robles' suggestions to the contrary, conditional certification "is not a mere formality." *Adair v. Wisconsin Bell, Inc*., 2008 WL 4224360, *3 (E.D. Wis. Sept. 11, 2008) (internal citations omitted).  "Rather, it serves as an important and functional step in the certification process.  Where the plaintiff has not made at least a modest factual showing that certification is appropriate, [i]t would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated.'" *Id*. at *4 (citing *Freeman v. Wal-Mart Stores, Inc*., 256 F.Supp.2d 941, 945 (W.D. Ark. 2003)). Conditional certification — especially with a proposed class of this size and the issues with opt-in discovery thus far — imposes significant burdens on employers, including the "tremendous financial burden" associated with discovery.  *Woods v. New York Life Ins. Co*., 686 F.2d 578,

581 (7th Cir. 1982). "[C]ourts must be careful to guard against wasting the parties' time and resources where certification is not appropriate at the outset." *Schroeder v. Humana Inc.*, Case No. 12-C-0137, 2012 WL 5931886 at *4 (E.D. Wis. Nov. 27, 2012).

## II. THERE IS NO COMMON POLICY THAT VIOLATES THE FLSA

Despite the Plaintiff's assertions to the contrary, the undisputed facts establish that Mercury Marine does not subject the purported class members to a common policy that violates the FLSA. As a result, conditional certification is improper and the Plaintiff's motion should be denied.

### A. The FLSA Permits Mercury Marine To Disregard Pre-Shift and Post-Shift Punches

The contention that Mercury Marine's pre-shift and post-shift Kronos Conventions constitutes an "unlawful rounding policy," which only rounds in Mercury Marine's favor, is simply wrong. Preliminarily, there is no rounding within the pre-shift/post-shift grace periods. Whether Mercury Marine's documentation explicitly refers to the pre-shift/post-shift periods as "grace periods," or whether the Company utilized the "grace period" function in the Kronos software is irrelevant and is putting form over substance. There is no question that employees, the union, and the Company's supervisors understand that the pre-shift and post-shift windows are time periods that are not working time and were not established periods for employees to work. For the employees' convenience, and with the union's knowledge and consent, Mercury Marine has had a longstanding practice of providing time before and after shifts during which employees can punch in/out but are not permitted to work unless authorized to do so. Mercury Marine then disregards those pre and post shift punches unless, as explained above, a supervisor has authorized an employee to work during those periods and edits their timecards to ensure they

QB\58554514.4

are compensated for such time. Notably, this practice is expressly contemplated and authorized under the FLSA. Specifically, the regulations provide:

> In those cases where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work. Their early or late clock punching may be disregarded.

29 C.F.R. § 785.48(a). This alone warrants denial of Plaintiffs' motion for conditional certification.

Robles argues that the mere fact that the purported class members' Kronos records show they were punched in before and/or after their scheduled shift, somehow establishes they were working during such time periods, and that Mercury Marine rounds a "significant number of minutes per day" in violation of 29 CFR § 785.48(a). However, as this Court has recognized, "[t]he mere act of clocking in before the start of a scheduled shift does not place the employer on notice that an employee begins to work before the scheduled start time." *Tom v. Generac Power Systems, Inc.*, 2018 WL 3696607, *5 (E.D. Wis. Aug. 3, 2018) (citing *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011)). As outlined above, the Company's Work Rules expressly prohibit employees from working outside their scheduled shift (and therefore during the grace periods) unless such work is approved by their supervisor. Mercury Marine does not maintain any policy or practice that requires union employees to work prior to or after their shift, which numerous purported class members admit. (Matthias Decl. at ¶ 4); (Christensen Decl. at ¶ 4); (Moore Decl. at ¶ 4); (Craig Decl. at ¶ 4); (Yanke Decl. at ¶ 4); (Will Decl. at ¶ 4); (Thomas Decl. at ¶ 4); (Sommers Decl. at ¶ 4); (Schneider Decl. at ¶ 4); (Roseler Decl. at ¶ 4); (Chavez Decl. at ¶ 4); (Peters Decl. at ¶ 4); (Lucek Decl. at ¶ 4); (Kuether Decl. at ¶ 4); (Karls Decl. at ¶ 4); (Kalebic Decl. at ¶ 4); (Higginbotham Decl. at ¶ 4); (Eggers Decl. at ¶ 4); (Cooper Decl. at ¶ 4); (Wichmann Decl. at ¶ 4). Employees who punch in/out during the grace periods windows do

22

so voluntarily, for their own convenience, and engage in personal activities during this time. (Matthias Decl. at ¶¶ 2-3); (Christensen Decl. at ¶¶ 2-3); (Moore Decl. at ¶¶ 2-3); (Craig Decl. at ¶¶ 2-3); (Yanke Decl. at ¶¶ 2-3); (Will Decl. at ¶¶ 2-3); (Thomas Decl. at ¶¶ 2-3); (Sommers Decl. at ¶¶ 2-3); (Schneider Decl. at ¶¶ 2-3); (Roseler Decl. at ¶¶ 2-3); (Chavez Decl. at ¶¶ 2-3); (Peters Decl. at ¶¶ 2-3); (Lucek Decl. at ¶¶ 2-3); (Kuether Decl. at ¶¶ 2-3); (Karls Decl. at ¶¶ 2-3); (Kalebic Decl. at ¶¶ 2-3); (Higginbotham Decl. at ¶¶ 2-3); (Eggers Decl. at ¶¶ 2-3); (Cooper Decl. at ¶¶ 2-3); (Wichmann Decl. at ¶¶ 2-3). The contention that employees are working during these time periods — only supported by three declarations (one of which, David Hall's, was undermined by his testimony when deposed) — certainly does not warrant conditional certification and class notices being sent to a group of over 3,500 individuals.

Further, as outlined above, Mercury Marine takes precautions to ensure that its employees are not working outside of their shift without supervisory or management authorization. These include: (1) providing new hire orientation regarding the Company's Work Rules, Kronos, and punch-in procedures; (2) instituting department-specific training (led by supervisors) related to shift start and end procedures; (3) utilizing, in many departments, overlapping schedules so that employees can (while on the clock) discuss any issues from a prior shift and any work required to be done; (4) having supervisors who are able to monitor for unauthorized pre/post shift work; (5) routinely adjusting employees' time cards to compensate them for authorized work performed outside of their shift; (6) offering supervisory, union, human resources, and ethics hotline support to address *any* concern that employees are working outside of their scheduled shift; and (7) regularly disciplining and counseling purported class members who work outside of their shifts without supervisory authorization, including during the grace periods. "Where there is evidence that employers have, and enforce, appropriate pay

policies, that evidence weighs strongly against conditional certification." *Generac*, 2018 WL 3696607, *4 (citing *Nieddu v. Lifetime Fitness, Inc.*, 977 F.Supp.2d 686, 703 (S.D. Tex. 2013)).

Accordingly, Mercury Marine's pre-shift and post-shift grace periods, during which employees are prohibited from working, are lawful under 29 C.F.R. §785.248(a). Robles' attempt to fashion these into an unlawful "rounding policy" that rounds off compensable work time flies in the face of all of the evidence and should therefore be rejected.

### B. Mercury Marine's Employees Understand They Cannot Work Outside of Their Shifts Without Authorization

Robles' primary argument is that Mercury Marine has "fostered a culture" that permits the purported class members to perform uncompensated work during the grace periods in an effort to reach its production goals. This claim is baseless for a number of reasons.

Preliminarily, this case involves a unionized workforce and the union representing Mercury Marine's employees does not allow them to work for free. It defies logic that represented employees would be routinely working, as Plaintiffs' counsel contends, up to potentially 20 minutes per shift, per week, and not getting compensated for such time and that the union would not take issue with such a practice. As demonstrated by the six declarations from the union's most senior leadership at the facilities across Fond du Lac campus, *all of whom are also purported class members*, they too confirm that employees know they are prohibited from working outside their scheduled shift without authorization; understand they are supposed to start and stop work according to the bell schedules; and do not work before or after their scheduled shifts without authorization. (Walker Decl. at ¶¶ 1, 3, 5-7); (Morin Decl. at ¶¶ 1, 3, 5-7); (Beahm Decl. at ¶¶ 1, 3, 5-7); (Bader Decl. at ¶¶ 1, 3, 5-7); (Weeks Decl. at ¶¶ 1, 3, 5-7); and (Ellis Decl. at ¶¶ 1, 3, 5-7). Additionally, the executive union leadership confirmed that if employees were performing work during the grace periods for which they were not being

compensated, the union would have addressed the issue with the Company, and potentially filed a grievance or grievances related to any such practice. (Walker Decl. at ¶ 9); (Morin Decl. at ¶ 9); (Beahm Decl. at ¶ 9); (Bader Decl. at ¶ 9); (Weeks Decl. at ¶ 9); and (Ellis Decl. at ¶ 9). The union has not had to do this because, as noted above, this issue has never been raised with or observed by the union's leadership, some of whom have worked at Mercury Marine for well over twenty years. (Walker Decl. at ¶¶ 1-2, 8-9); (Morin Decl. at ¶¶ 1-2, 8-9); (Beahm Decl. at ¶¶ 1-2, 8-9); (Bader Decl. at ¶¶ 1-2, 8-9); (Weeks Decl. at ¶¶ 1-2, 8-9); and (Ellis Decl. at ¶¶ 1-2, 8-9). And Mercury Marine has agreed, through the CBA, to pay the purported class members *both* regular wages and overtime in a manner that is more generous than required under the FLSA or Wisconsin law, undercutting any contention that it is trying skirt its responsibilities to lawfully compensate the purported class members.

Further, although only a sampling, the declarations of numerous purported class members (far more than the three declarations Plaintiff submitted in support of her motion) also confirm that the purported class members: (1) understand they are prohibited from working outside their scheduled shift without authorization; (2) understand they are supposed to start and stop work according to the bell schedules unless otherwise authorized by their supervisor; (3) do not work before or after their scheduled shifts without authorization; (4) do not observe other purported class members working before or after their scheduled shift without authorization; (5) and know the resources they have through Mercury and the union if they believe they are not being properly compensated for their time worked. (Matthias Decl. at ¶¶ 1-6); (Christensen Decl. at ¶¶ 1-6); (Moore Decl. at ¶¶ 1-6); (Craig Decl. at ¶¶ 1-6); (Yanke Decl. at ¶¶ 1-6); (Will Decl. at ¶¶ 1-6); (Thomas Decl. at ¶¶ 1-6); (Sommers Decl. at ¶¶ 1-6); (Schneider Decl. at ¶¶ 1-6); (Roseler Decl. at ¶¶ 1-6); (Chavez Decl. at ¶¶ 1-6); (Peters Decl. at ¶¶ 1-6); (Lucek Decl. at ¶¶ 1-6);

(Kuether Decl. at ¶¶ 1-6); (Karls Decl. at ¶¶ 1-6); (Kalebic Decl. at ¶¶ 1-6); (Higginbotham Decl. at ¶¶ 1-6); (Eggers Decl. at ¶¶ 1-6); (Cooper Decl. at ¶¶ 1-6); and (Wichmann Decl. at ¶¶ 1-6). Moreover, Hall admitted in his deposition that no one at Mercury Marine has ever required or instructed him to work during the grace periods without authorization, and that the only reason he did so was *for his own convenience*. (Hall Dep. at p. 51.)

The declarations from the Company's supervisors also dismantle Plaintiffs' fantastical claims. Indeed, Mercury Marine's supervisors — many of them who previously worked in the purported class member's positions — have submitted declarations from their experiences in different departments, plants, and shifts at Mercury Marine's facilities, and all confirm the same facts. Significantly, these individuals: (1) deny seeing employees work outside of their scheduled shifts, except where authorized; (2) deny requiring or permitting employees to work outside their shift without adjusting the employees' schedule to pay for that additional time; and (3) are not aware of any union employees working any time during the grace periods without being paid. (Toshner Decl. at ¶¶ 1-7); (Neubauer Decl. at ¶¶ 1-7); (Fellenz Decl. at ¶¶ 1-6); (Tank Decl. at ¶¶ 1-7); (Whiting Decl. at ¶¶ 1-7); (Aldrete Decl. at ¶¶ 1-7); (Willis Decl. at ¶¶ 1-6); (Jolin Decl. at ¶¶ 1-7); (Fraser Decl. at ¶¶ 1-7); (Kroeger Decl. at ¶¶ 1-7); (Wilson Decl. at ¶¶ 1-6); (Nowland Decl. at ¶¶ 1-6); (Olson Decl. at ¶¶ 1-7); (Schultz Decl. at ¶¶ 1-7); (Wirkus Decl. at ¶¶ 1-6); (Wyrobeck Decl. at ¶¶ 1-6); (Slater Decl. at ¶¶ 1-7); (Gerlach Decl. at ¶¶ 1-7); (Disterhaft Decl. at ¶¶ 1-6); (Newton Decl. at ¶¶ 1-7); (Nelson Decl. at ¶¶ 1-6); (Pickart Decl. at ¶¶ 1-7); (Garriety Decl. at ¶¶ 1-7); (Rising Decl. at ¶¶ 1-7); (Weber Decl. at ¶¶ 1-7); (Manecke Decl. at ¶¶ 1-7); and (Gustafson Decl. at ¶¶ 1-7).

Accordingly, Robles' contention that Mercury Marine "fosters a culture" of permitting employees to work during the pre and post-shift grace periods for its own benefit is meritless.

The undisputed evidence is clear that the Company prohibits the purported class members from working outside of their scheduled shift without authorization, and this prohibition is well understood and followed by the purported class members.

## III.   ROBLES AND THE FEW REMAINING OPT-IN PLAINITFFS ARE NOT SIMILARLY SITUATED TO THE PROPOSED OVERBROAD CLASS

As established above, the actual pre-shift and post-shift experiences of the named Plaintiff and the few remaining opt-in Plaintiffs vary widely depending on their job duties, facility, department, supervisor, schedule patterns, and shift.  These differences demonstrate that they are not similarly situated to the thousands of employees they seek to include in their overbroad class.  *Bolden v. Walsh Construction Company*, 688 F.3d 893, 896 (7th Cir. 2012) (cases in which supervisory employees use discretion to make individual decisions without guidance from an overarching company policy do not satisfy commonality requirement under Fed.R.Civ.P. 23 because the evidence varies from plaintiff to plaintiff).

### A.   The Purported Class Members' Individual Experiences Are Varied And Their Claims For Compensation Require An Individualized, Fact Intensive Inquiry

This lawsuit is based entirely on the assumption that the purported class members are working outside their scheduled shift in violation of the Company's Work Rules.  To the extent that some employees may have worked outside their shift in violation of Mercury Marine's Work Rules (of which Plaintiff has only provided allegations from three), their claims for compensation would require individualized analysis of the nature and extent of work performed outside the shift, and each employee's reason(s) for working outside the shift (among other considerations).

The resolution of these issues will vary significantly across the proposed class.  As noted above, Robles seeks to conditionally certify a class comprised of more than *3,500* current and

27

former union employees who worked in different job categories, facilities, shifts, and with numerous different supervisors. These supervisors have the authority to, and do, select various schedules and shift patterns for the bargaining unit employees. Some supervisors elect to use overlapping shifts (so employees changing over are both on the clock to discuss any issues that may have arisen during a shift). (Toshner Decl. at ¶ 6); (Neubauer Decl. at ¶ 6); (Tank Decl. at ¶ 6); (Whiting Decl. at ¶ 6); (Aldrete Decl. at ¶ 6); (Jolin Decl. at ¶ 6); (Fraser Decl. at ¶ 6); (Kroeger Decl. at ¶ 6); (Olson Decl. at ¶ 6); (Schultz Decl. at ¶ 6); (Slater Decl. at ¶ 6); (Gerlach Decl. at ¶ 6); (Newton Decl. at ¶ 6); (Pickart Decl. at ¶ 6); (Garriety Decl. at ¶ 6); (Rising Decl. at ¶ 6); (Weber Decl. at ¶ 6); (Manecke Decl. at ¶ 6); and (Gustafson Decl. at ¶ 6). Some supervisors begin their employees' shifts with pre-work stretching, while others begin the shifts with a team huddle and then stretching. (Gardiner Dep. at p. 146.)

And the above does not even take into consideration the significant differences between employees' job duties across areas such as heat treat, assembly, and machining. It is without question that the purported class members work in varying environments, with some employees working closely with team members assembling a motor, while others are working independently across plants completing maintenance work. While others are doing heat treatment tasks, product testing, machining, or packaging of finished products. These different tasks — and the ability for an individual to even begin working on certain tasks pre-shift or continue working post-shift — are, at a minimum, position-specific and class treatment related to whether employees are able to perform them before or after their scheduled shift is therefore inappropriate.

As outlined above, Hall confirmed the significant differences between departments and the impact this has on the potential for an employee to complete pre- or post-shift work at

Mercury Marine.[1]  Specifically, Hall admitted in his deposition that while he worked in the Assembly Department, there was really no opportunity or other employees in the department to complete any pre-shift work and he therefore did not complete any work outside of his scheduled shift during that time period.  (Hall Dep. at pp. 41-42.)  He also admitted to the varying supervisory practices at Mercury Marine, acknowledging that while he worked in first shift there was more flexibility, and he would inform his supervisor that he was going to begin work early and that his supervisor would authorize him to do so and alter his time card to reflect the additional time.  (Hall Dep. Tr. at pp. 29-30.)  Hall claims that on fifth shift such practices were not allowed and he did not perform any work outside of his scheduled shift.  (*Id*.)  These differences accurately reflect the individualized nature of the claims at issue and confirm why conditional certification is not appropriate.

This Court's recent decision in *Generac*, 2018 WL 3696607 (E.D. Wis. Aug 3, 2018), is directly on point (and conspicuously absent from Plaintiff's Brief).  *Generac* involved very similar facts to those at issue here.  Specifically, Generac paid hourly employees to the shift, but permitted them to be punched in before and after shift for employees' convenience.  (*Id*. at * 2.)  Like Mercury Marine, Generac also prohibited unauthorized overtime and expected hourly employees to bring pay errors to the attention of their supervisor or payroll.  (*Id*. at * 4.)  Generac also provided its hourly employees cues to signal the start and end of the shift, including buzzers that sound in the facility and a visual alert of the scheduled start and end times when hourly employees punch in.  (*Id*. at *5.)

---

[1] Robles only worked for Mercury Marine for a short period of time (i.e., less than three months, and in the same plant and department) so she has no knowledge of the differences between departments and shift differentials at the Company.  (Robles Dep. Tr. at pp. 26-27, 33.)

Nevertheless, the plaintiff, like Robles, filed a putative collective action under the FLSA seeking to represent all current and former hourly, non-exempt manufacturing employees that worked at Generac's Wisconsin facilities. (*Id*. at *1.) In denying the plaintiff's motion for conditional certification, Judge William Griesbach explained:

> Against this backdrop, the reason that Tom is not similarly situated to the proposed class of hourly manufacturing employees becomes clear: to the extent that Tom performed compensable work outside his scheduled shift times meaning between the time he clocked in and the time his shift began or between the time his shift ended and the time he clocked out – he was doing so of his own accord, without the authorization of his supervisors, and contrary to company policy.

(*Id*. at *5.) The Court concluded that because the plaintiff's claims "arise out of his individual actions and do not demonstrate a nexus between his experience and the experience of the members of the proposed class, the court finds that conditional certification is not appropriate in this case." (*Id*. at *6.) *See also Babineau v. Fed Ex Corp*., 576 F.3d 1183, 1191-94 (11th Cir. 2009) (denying Rule 23 class certification of claims for pre and post shift work because alleged policy of encouraging employees to be at work early or stay late would not predominate over individualized issues of whether and why any employee worked before or after his/her shift.)

The same result follows here. Mercury Marine's employees are obligated per the terms of the CBA to work only their scheduled hours, nothing more, unless authorized to work outside of their schedule by their supervisor. Mercury Marine's Human Resources Department explains this to the purported class members during general orientation and supervisors are aware of and monitor compliance with this rule, including disciplining employees for work outside of their shift without authorization and routinely adjusting union employees' Kronos records to pay for authorized work outside the shift. Like at Generac, bells sound at the beginning and end of shifts to signal to employees when it is time to start and stop working. Thus, to the extent that Robles, Hall or the few other remaining opt-ins performed any unauthorized work during the pre/post-

30

shift grace periods, they did so at their own accord, without the authorization of their individual supervisors, and contrary to Mercury Marine's policy. Further, even if these individuals claimed their supervisors instructed and/or authorized them to engage in such pre-shift or post-shift work and were not compensated for such time (which they have not even alleged), the actions of such rogue supervisors, which are clearly contrary to Mercury Marine's Work Rules and established compensation policies, would not support a class-wide claim of 3,500 individuals who were not managed by or overseen by such individuals. These claims arise out of Robles and the opt-in Plaintiffs' own personal choices and do not establish that they are similarly situated to the proposed class of approximately 3,500 individuals. Accordingly, and as in *Generac*, conditional certification is inappropriate here.

### B. Mercury Marine's Defenses Will Require An Individualized Inquiry

Mercury Marine's defenses will also require individualized inquiry. "The FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about." *Kellar*, 664 F.3d at 177. Mercury Marine will defend that it had no knowledge of any employees working outside their shift without authorization. Significantly, numerous purported class members — from across departments and shifts — deny that employees have ever been instructed to work during the grace periods if they were not scheduled to work during such times. (Matthias Decl. at ¶ 5); (Christensen Decl. at ¶ 5); (Moore Decl. at ¶ 5); (Craig Decl. at ¶ 5); (Yanke Decl. at ¶ 5); (Will Decl. at ¶ 5); (Thomas Decl. at ¶ 5); (Sommers Decl. at ¶ 5); (Schneider Decl. at ¶ 5); (Roseler Decl. at ¶ 5); (Chavez Decl. at ¶ 5); (Peters Decl. at ¶ 5); (Lucek Decl. at ¶ 5); (Kuether Decl. at ¶ 5); (Karls Decl. at ¶ 5); (Kalebic Decl. at ¶ 5); (Higginbotham Decl. at ¶ 5); (Eggers Decl. at ¶ 5); (Cooper Decl. at ¶ 5); and (Wichmann Decl. at ¶ 5). Similarly, the Company's supervisors (many of whom previously worked in the

31

purported class members' roles) and union's senior leadership deny seeing employees work before or after their scheduled shift without authorization, and deny that any union employees have complained to them about performing work outside their scheduled shift without being compensated. (Toshner Decl. at ¶¶ 3-5); (Neubauer Decl. at ¶¶ 3-5); (Fellenz Decl. at ¶¶ 3-5); (Tank Decl. at ¶¶ 3-5); (Whiting Decl. at ¶¶ 3-5); (Aldrete Decl. at ¶¶ 3-5); (Willis Decl. at ¶¶ 3-5); (Jolin Decl. at ¶¶ 3-5); (Fraser Decl. at ¶¶ 3-5); (Kroeger Decl. at ¶¶ 3-5); (Wilson Decl. at ¶¶ 3-5); (Nowland Decl. at ¶¶ 3-5); (Olson Decl. at ¶¶ 3-5); (Schultz Decl. at ¶¶ 3-5); (Wirkus Decl. at ¶¶ 3-5); (Wyrobeck Decl. at ¶¶ 3-5); (Slater Decl. at ¶¶ 3-5); (Gerlach Decl. at ¶¶ 3-5); (Disterhaft Decl. at ¶¶ 3-5); (Newton Decl. at ¶¶ 3-5); (Nelson Decl. at ¶¶ 3-5); (Pickart Decl. at ¶¶ 3-5); (Garriety Decl. at ¶¶ 3-5); (Rising Decl. at ¶¶ 3-5); (Weber Decl. at ¶¶ 3-5); (Manecke Decl. at ¶¶ 3-5); and (Gustafson Decl. at ¶¶ 3-5); (Walker Decl. at ¶¶ 7-9); (Morin Decl. at ¶¶ 7-9); (Beahm Decl. at ¶¶ 7-9); (Bader Decl. at ¶¶ 7-9); (Weeks Decl. at ¶¶ 7-9); and (Ellis Decl. at ¶¶ 7-9). And the union has never filed a grievance related to this issue. Evaluating each employee's claim will require an individualized determination of whether, against this backdrop, there is any basis to conclude that Mercury Marine knew or should have known that the employee at issue was working outside the shift on each given day at issue in violation of the Company's Work Rules.

Some class members' claims may also be subject to a de minimis defense or an offset for the time they are compensated for wash-up when they are not performing any work. For example, Kronos records reflect that Robles frequently punched in less than 5 minutes prior to her shift start. (Kruzel Decl. at ¶ 3, Ex. B.) Robles herself acknowledged that when she punched in that close to her shift start, that she could only allegedly do a limited amount of prep work. (Robles Dep. at p. 78.) The Company will defend that these few minutes are not compensable

work and/or is de minimis, or that it should be off-set based on the time she spent washing up at the end of her shift for which she was compensated.

Thus, evaluating each purported class members' claim for compensation will require individualized examination of multiple factors including, without limitation: (1) whether the employee engaged in work outside the shift; (2) the nature/type of work performed outside the shift; (3) the amount of work performed outside the shift; (4) whether the work performed outside the shift was compensable work under the FLSA; (5) the employee's reason for violating Mercury Marine's Work Rules and working outside his or her shift without authorization; (6) whether the Company knew or had reason to know the employee worked outside the shift without authorization; and (7) whether the claim is subject to other Company defenses (e.g., the work is de minimis, whether the time at issue should be offset, or the given plaintiff's allegations lack credibility).

Such highly individualized inquiries, and the varying results, are unsuited for class treatment and "would substantially eliminate the judicial efficiency, and the resulting benefit to the parties, traditionally attained through the collective treatment." *Steger v. Life Time Fitness, Inc*., 2016 WL 245899, *4 (N.D. Ill. Jan. 21, 2016) (denying conditional certification because "a highly individualized analysis would nonetheless be necessary to determine the extent to which each employee worked off the clock and whether that conduct was attributable to" the employer). *Adair*, 2008 WL 4224360 at *7 (denying conditional certification because "[a]lleged FLSA violations stemming from the enforcement decisions of individual supervisors, rather than a company-wide policy or plan are not appropriate for collective treatment"). Further, given the issues presented with attempting to obtain discovery from the opt-in plaintiffs to date, there is no reason to believe that further discovery is warranted or appropriate. Because it is clear even at

33

this initial stage that Plaintiffs' claims require individualized inquiry not amenable to collective action or relief, the motion for conditional certification must be denied.

## IV.   THE PROPOSED NOTICE IS DEFICIENT AND THE CLASS LIST REQUEST IS UNREASONABLE

As outlined above, conditional certification is not appropriate here. Nonetheless, even if the court were to grant conditional certification, Plaintiffs' proposed notice should be rejected due to its deficiencies.

For one, Section B represents that the claims relate to impermissible rounding. This is mischaracterization of the claims, and a clear effort to fit the case under 29 C.F.R. § 785.48(b), which is inapplicable here. Robles is actually claiming that the purported class members are working outside their authorized work schedules without compensation. Section B should be revised to accurately describe Robles' claim.

Additionally, the notice improperly fails to make any mention of the fact that by opting-in, employees may be required to participate in the case, including at a deposition or at trial. The following sentence should be added to the first paragraph of Section E: "If you join this action, you may be required to provide information or otherwise participate in the case, which may include sitting for a deposition or testifying at trial."

Finally, the 10 days requested by Plaintiff is not a sufficient amount of time for Mercury Marine to compile an accurate list of approximately 3,500 current and former employees. Should the Court conditionally certify a class and order the Company to produce a list of putative class members, the Company respectfully requests 30 days to provide such information.

## CONCLUSION

The overwhelming evidence makes clear that Mercury Marine does not permit employees to work during the pre-shift and/or post-shift grace periods, that the Company takes various

34

measures to ensure that employees do not work outside their scheduled shift without authorization, and that the purported class members — and the union, including its most senior leadership, representing them — understand the Company's expectations and employees do not work outside their scheduled shift without authorization. No amount of further discovery is going to unearth any common unlawful policy. For the foregoing reasons, Mercury Marine asks this Court to deny Plaintiffs' Motion for Conditional FLSA Class Certification and to dismiss the opt-in Plaintiffs. *See Botero v. Commonwealth Limousine Serv. Inc.*, 302 F.R.D. 285, 286 (D. Mass. 2014) (FLSA opt-in plaintiffs are no longer part of the case where conditional certification motion was denied); *Prescott v. Prudential Ins. Co.*, 729 F.Supp.2d 357, 370 (D. Me. 2010) (noting that if an FLSA conditionally certified class was subsequently decertified, any "opt-in" plaintiffs would be dismissed without prejudice).

s/*Steven M. Kruzel*
Sean M. Scullen, SBN 1034221
sean.scullen@quarles.com
Steven M. Kruzel, SBN 1086539
steven.kruzel@quarles.com

**Quarles & Brady LLP**
411 East Wisconsin Avenue
Suite 2350
Milwaukee, WI 53202-4426
(414) 277-5645 (office)
(414) 978-8863 (facsimile)

**Attorneys for Defendant**

QB\58554514.4