UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SANDY ROBLES, Individually and on
Behalf of All Others Similarly Situated,

    Plaintiff,

  v.            Case No. 18-CV-1809

BRUNSWICK CORPORATION,
d/b/a MERCURY MARINE,

    Defendant.

## ORDER

Plaintiff Sandy Robles brings this suit on behalf of herself and all others similarly situated against her employer, Defendant Brunswick Corporation d/b/a Mercury Marine, alleging that "Mercury Marine has a common policy and practice of impermissibly rounding the start and end times of its production and maintenance employees' work hours so as to deny such employees for [sic] compensation for all hours worked." (ECF No. 23, ¶ 1.) Robles alleges this was done in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.*, and Wisconsin wage and hour laws, Wis. Stat. §§ 109.01 *et seq.*, 104.001 *et seq.*, 103.01 *et seq.*; and Wis. Admin. Code §§ DWD 272.001 *et seq.*, 274.001 *et seq.*

Before the court is Robles's motion for conditional class certification and court facilitated notice. (ECF No. 24.) The motion only addresses the potential federal law violation and asks the court to certify the following collective action class:

> All production and maintenance employees who are or have been employed by Mercury Marine at it's [sic] Fond du Lac campus, including Plants 3, 4, 15, 15L, 15S, 17, and 98 at any time since November 15, 2015.

(*Id.* at 1.) Robles also requests that the court appoint counsel of record as collective action counsel, order the defendant to produce within thirty days[1] a list of all people known to the defendant who belong to the proposed class, and allow potential collective action members forty-five days from the date of the mailing of the notice to opt in. (*Id.* at 1-2.)

All parties have consented to the full jurisdiction of a magistrate judge. (ECF Nos. 111, 114.) Briefing on the motion is complete and the matter is ready for resolution.

**1. Background**

Mercury Marine's corporate headquarters are located in Fond du Lac, Wisconsin. (ECF No. 96, ¶ 2.) It is a marine propulsion manufacturer and sells marine parts and accessories. (ECF No. 28-1 at 24.) Its Fond du Lac campus[2] is broken into seven different plants: 3, 4, 15, 15L, 15S, 17, and 98. (*Id.* at 24-25.) Each facility has production employees, but not every facility has maintenance employees. (*Id.* at 26.)

---

[1] Robles initially asked for this list to be produced within ten days. (ECF No. 29 at 29.) After Mercury Marine requested thirty days (ECF No. 97 at 34), Robles stated she had no objection (ECF No. 102 at 16).
[2] Although Mercury Marine also has a Brookfield, Wisconsin location, Robles is only seeking conditional class certification for employees at the Fond du Lac campus plants. (ECF No. 29 at 3, fn.1)

As of May 1, 2019, the Fond du Lac location had 2,276 production and maintenance employees. (ECF No. 28-1 at 28.) There are several different job classifications (for example, I, II, III, and line leader) and job titles (such as Machinist Technician, Die Cast Supertech, Paint Technician, and Assembly Tech Line Leader) among the production and maintenance employees. (ECF No. 96, ¶ 3.) The production and maintenance employees are represented by the International Association of Machinists (the Union). (ECF No. 28-1 at 26.) According to Mercury Marine's compensation policies and procedures, employees must be paid for all the time they are scheduled to and actually work. (ECF No. 96, ¶ 5.) However, employees are subject to discipline if they work overtime without receiving prior approval. (ECF Nos. 28-8, 28-9, 28-10, 28-11, 28-12, 28-13.)

To keep track of the employees' time worked, Mercury Marine uses an attendance timekeeping system called Kronos. (ECF No. 28-1 at 66.) An employee places her badge in front of the machine to "punch in" or "wand in" and a green light will flash. (*Id.* at 67.) While the employee's schedule does not automatically display, the employee can view it. (*See* ECF No. 98-3 at 21-22.) Employees are taught how to use this system during their training. (ECF No. 28-1 at 67.)

Employees can punch in anytime within the twenty-nine minute window before the beginning of their scheduled shift. (ECF No. 28-6 at 2.) However, for compensation purposes the time will round up to the employee's scheduled start time. (ECF No. 28-1 at 102.) For example, if an employee's shift is scheduled to begin at 10:30 a.m. but she

3

Case 2:18-cv-01809-WED   Filed 01/09/20   Page 3 of 17   Document 120

punches in at 10:01 a.m., her time for compensation purposes will begin at 10:30 a.m. Similarly, an employee has fourteen minutes[3] after the end of her scheduled shift to punch out. (ECF No. 28-1 at 116.) Again, however, the time is rounded back to the end of the employee's scheduled shift. (*Id.*) For example, if an employee's shift is scheduled to end at 5:00 p.m but she punches out at 5:13 p.m., her time for compensation purposes rounds back to 5:00 p.m. Any punches recorded more than twenty-nine minutes pre-shift or more than fourteen minutes post-shift are flagged as an exception, and a supervisor must approve the time. (*Id.* at 116-17.) If an employee punches in late or punches out early, the time is tracked by the minute, and the employee is only paid for the time actually worked. (*Id.* at 104.)

Rather than calling this "rounding," Mercury Marine refers to the process as a "grace period." (ECF No. 28-1 at 103.) It asserts that the purpose of the grace period is to allow employees to avoid lines at the time machine at the start and end of their shifts. (*Id.* at 103-04.) After punching in, but before the start of the scheduled shift time, the employees are free to chat with co-workers, read the newspaper, have a cup of coffee, or

---

[3] The court notes there is a discrepancy in the declarations, depositions, exhibits, and parties' briefs regarding whether the rounding occurs fourteen or fifteen minutes after the shift has ended. While most documents refer to fourteen minutes, Mercury Marine's Decisions Document regarding "Time & Attendance System Implementation" states, "The early in rounding will be 29 minutes or less and late out rounding is 15 minutes or less." (ECF No. 28-6 at 2.) While this discrepancy is not material for purposes of this motion, any internal discrepancies in the court's decision are due to the court using whichever value the source cited used.

do whatever other non-work activity they wish to do. (*Id.* at 103.) A bell rings at the start and end of the shift. (*Id.* at 157.)

Robles claims that Mercury Marine's rounding policy has caused her and the putative collective action class members to be undercompensated for work performed after punching in but before the scheduled start of the shift and for work performed after the scheduled end of the shift but before punching out. (*See* ECF Nos. 28-2 at 43, 96-97, 104, 113; 25, ¶ 16; 26, ¶ 16; 27, ¶ 16.) Seven plaintiffs have opted in to the class: Guy Damerow, Andrew Fox, David Hall, Alexandria Lockwood, Matthew Morreau, Ray Pfantz, and Donnie Samuel. (ECF Nos. 14, 15, 19.) Hall has been deposed. (ECF No. 98-3.) Lockwood (ECF No. 25), Hall (ECF No. 26), and Fox (ECF No. 27) each submitted a declaration. Six other prospective class members originally opted in but have since dropped out of the class: four were terminated for lack of prosecution relating to their failure to respond to discovery requests (ECF No. 118), and two opted out after previously opting in (ECF No. 21). *See Hatton v. Cablecom, LLC*, No. 14-CV-1459, 2015 WL 4113441, at *6 (E.D. Wis. July 8, 2015) ("[C]ourts have found that a 'demonstrable lack of interest in a collective action is a strike against certification[.]'") (citing *Hadley v. Journal Broad. Group, Inc.*, No. 11-CV-147, 2012 U.S. Dist. LEXIS 19452, at *15 (E.D. Wis. Feb. 16, 2012)).

Opt-in plaintiff Lockwood declares that she does the following pre-shift work:

> I would talk with the individual working at [the] workstation from the prior shift about what I was going to be working on during my shift and the work

5

> orders. Additionally, I would talk to this individual about any problems he or she had encountered and how to deal with those problems.

(ECF No. 25, ¶ 9.) She states that she "needed to take these actions to be able to perform [her] job at the scheduled shift time[,]" and "[t]his work that [she] would perform prior to the scheduled shift-start time was integral to [her] assigned job duties and [she] could not efficiently perform [her] job without doing these tasks." (*Id.*) Lockwood states that she is

> aware of many other Mercury Marine employees working during the 29-minute pre-shift period as [she] sees them performing work. It is a common occurrence that happens daily. Mercury Marine has fostered a culture that permits its employees to perform work during the 29-minute pre-shift period. This pre-shift work allows [her], and others, to meet Mercury Marines [sic] production goals.

(*Id.*, ¶ 11.) Opt-in plaintiffs Hall and Fox offered similar testimony in their declarations. (ECF Nos. 26, 27.)

**2. Standard for Conditional Certification**

Under the FLSA, a collective action "may be maintained against any employer … by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). A collective action under the FLSA is different from a class action under Federal Rule of Civil Procedure 23 in that individuals must affirmatively opt in to the lawsuit rather than being automatically added to the class. *Woods v. New York Life Ins. Co.*, 686 F.2d 578, 579-80 (7th Cir. 1982). A class member opts in to a collective action by giving his or her written consent. 29 U.S.C. § 216(b).

"District courts may, in their discretion, facilitate notice to potential plaintiffs to a FLSA collective action, to implement this 'opt in' procedure." *Adair v. Wisconsin Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *2 (E.D. Wis. Sept. 11, 2008). "The critical inquiry in determining whether a court should exercise its discretion to authorize the sending of notice to potential plaintiffs is whether the representative plaintiff has shown that she is similarly situated to the potential class plaintiffs." *Austin v. CUNA Mut. Ins. Soc.*, 232 F.R.D. 601, 605 (W.D. Wis. 2006).

In determining whether the plaintiff and the putative collective action members are "similarly situated," this court, like many other courts, follows a two-stage process. *See Ehmann v. Pierce Mfg. Inc.*, No. 16-C-247, 2016 WL 5957275, at *2 (E.D. Wis. Oct. 13, 2016) (citing *Adair*, 2008 WL 4224360, at *8). At the first stage, "the court must determine whether the plaintiff has demonstrated a 'reasonable basis' for believing that she is similarly situated to potential class members." *Adair*, 2008 WL 4224360, at *3 (quoting *Austin*, 232 F.R.D. at 605.) "The plaintiff may present factual support in the form of affidavits, declarations, deposition testimony, or other documents in order to demonstrate some 'factual nexus between the plaintiff and the proposed class or a common policy that affects all the collective members.'" *Ehmann*, 2016 WL 5957275, at *2 (quoting *Nehmelman v. Penn Nat'l Gaming, Inc.*, 822 F. Supp. 2d 745, 750 (N.D. Ill. 2011)). This is a "lenient standard." *Id.* This conditional certification enables notification to

putative class members so that they may affirmatively opt in to the collective action and class discovery may be taken. 29 U.S.C. § 216(b); *Woods*, 686 F.2d at 579-80.

However, conditional certification should not be characterized as "a 'mere formality.'" *Ehmann*, 2016 WL 5957275, at *2 (quoting *Adair*, 2008 WL 4224360, at *3). Discovery can impose considerable demands upon an employer if a class is conditionally certified, so "courts must be careful to guard against wasting the parties' time and resources where certification is not appropriate at the outset." *Id.* (citing *Adair*, 2008 WL 4224360, at *4).

The second stage in the collective action certification process occurs after conditional certification and normally when the defendant files a motion for decertification. *Tom v. Generac Power Sys., Inc.*, No. 17-C-1413, 2018 WL 3696607, at *3 (E.D. Wis. Aug. 3, 2018) (citing *Miller v. ThedaCare Inc.*, No. 15-CV-506, 2016 WL 4532124, at *4 (E.D. Wis. Aug. 29, 2016)). At the second stage, "the court must determine whether the plaintiffs who have opted in are, in fact, similarly situated." *Id.* Additionally, "the court assesses whether continuing as a collective action provides efficient resolution in one proceeding of common issues of law and fact." *Id.*

3. **Analysis**

At this stage in the inquiry, the court's focus is not on whether any policy at Mercury Marine violated the FLSA. *Tom*, 2018 WL 3696607, at *4. Rather the focus is on "whether the admissible evidence in the record constitutes a modest factual showing as

8
Case 2:18-cv-01809-WED    Filed 01/09/20    Page 8 of 17    Document 120

to the existence of a nexus between [Robles] and the members of the proposed class with regard to [Mercury Marine]'s alleged policies and practice." *Id.*

As stated above, Robles asks the court to certify a collective class consisting of all production and maintenance employees who are or have been employed by Mercury Marine at its Fond du Lac campus, including Plants 3, 4, 15, 15L, 15S, 17, and 98, at any time since November 15, 2015. According to Mercury Marine, that proposed class would consist of over 3,500 current and former employees. (ECF No. 97 at 27-28.) Robles argues that all putative collective action members have been subjected to the same rounding policies and have not been compensated for any time they worked in the twenty-nine minutes before the beginning of their shift or in the fourteen minutes after their shift ended. This rounding policy, Robles argues, rounds only in Mercury Marine's favor and has led to significant differences between the scheduled work times and the amount of time actually worked. (ECF No. 29 at 22.)

To show these differences, Robles submitted the declaration of Attorney Larry Johnson, who analyzed the punch-in and punch-out data of Robles and four opt-in plaintiffs: Andrew Fox, Kelly Dauman, Aaron Golemgeski, and Alexandria Lockwood. (ECF No. 28.) Dauman has since opted out of the class, and the court has dismissed Golemgeski as a class member. Because Dauman and Golemgeski are no longer class members, the court will disregard any analysis of their data. *See* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in

9

writing to become such a party and such consent is filed in the court in which such action is brought.").

Of the over 1,000 workdays analyzed for Lockwood, 12,778 punch-in minutes were rounded in favor of Mercury Marine. (ECF No. 28 at 3.) For Fox, 883 days were analyzed. Eighty-five percent of the days analyzed resulted in a punch-in time rounded in favor of Mercury Marine, for a total of 5,705 rounded punch-in minutes. (*Id.*) For Robles, only eighty-four days were analyzed. On those days, 349 punch-in minutes were rounded in Mercury Marine's favor, for an average of 7.43 rounded minutes each day. (*Id.*)

Robles testified at her deposition that, upon joining Mercury Marine, she was told by her trainer to begin working right after punching in (ECF No. 28-2 at 40) and that, if she came in early, she needed to begin working right away so that she would not fall behind (*Id.* at 52). No other prospective class member has testified that he or she was expressly told during training to begin working immediately upon clocking in. The closest anyone comes are Lockwood, Hall, and Fox, all of whom state in their declarations that no one told them during orientation "that we were prohibited from working during either the 29-minute pre-shift period or the 14-minute post-shift period." (ECF Nos. 25, ¶ 7; 26, ¶ 7; 27, ¶ 7.) They all also state that, "After punching in, I would report to my work area and begin working." (ECF Nos. 25, ¶ 9; 26, ¶ 9; and 27, ¶ 9.) Moreover, they all state that "Mercury Marine was aware that we were performing work during the 29-minute pre-shift period because members of management would see myself and other

10
Case 2:18-cv-01809-WED   Filed 01/09/20   Page 10 of 17   Document 120

employees working during this time period. Despite seeing the work being performed, Mercury Marine did not discipline me for doing this work." (ECF Nos. 25, ¶ 13; 26, ¶ 13; and 27, ¶ 13.)

However, as Mercury Marine points out, at his deposition Hall admitted that he was never *required* to perform work during the pre- or post-shift periods, that he understood that he would only be paid from his scheduled start time until his scheduled end time unless his supervisor approved of him working outside of his scheduled shift, and that, by his own choice, he would sometimes start prep work before his shift started because "it makes the day a lot smoother[.]" (ECF No. 98-3 at 31-32, 51.)

Mercury Marine argues that no common policy exists among Robles and the putative collective action members because the FLSA allows it not to pay employees for the periods before and after their scheduled times as long as they do not perform work. (ECF No. 97 at 21-24.) In support, Mercury Marine points to 29 C.F.R. § 785.48(a), which states in its entirety,

> Time clocks are not required. In those cases where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work. Their early or late clock punching may be disregarded. Minor differences between the clock records and actual hours worked cannot ordinarily be avoided, but major discrepancies should be discouraged since they raise a doubt as to the accuracy of the records of the hours actually worked.

Mercury Marine also argues that it has numerous safeguards to make sure that employees do not work either before or after their scheduled shift time. (ECF No. 97 at

11

23.) Finally, Mercury Marine argues that the putative collective action members' claims are too individualized, as the members are from different departments, have varying roles and job titles, and work different shifts. (*Id.* at 27-34.)

To support its position, Mercury Marine submitted declarations from fifty-eight employees: twenty production and maintenance employees (ECF Nos. 45-59, 85-86, 89, 91-92), twenty-seven managers or supervisors (ECF Nos. 60-84, 87-88), six production and maintenance employees who are also members of union leadership (ECF Nos. 39-44), four human resource employees or training specialists (ECF No. 90, 93-95), and James Gardiner, Senior Director of Human Resources (ECF No. 96).

The human resources employees who submitted declarations state that employees have never been instructed to start work early (ECF Nos. 90, ¶ 4; 93, ¶ 4; 94, ¶ 4; 95 ¶ 4)—directly contradicting Robles's deposition testimony.

The twenty production and maintenance employees, all of whom would be included in Robles's proposed class, state in virtually identically-worded declarations that they "regularly punch in during the 29 minute pre-shift clock-in period and punch out during the 15 minute post-shift clock-out period and do not perform any work during these time periods." (*See, e.g.* ECF No. 45, ¶ 3.) They all state that they "understand that the purpose of such time is to allow [them] to clock-in and then put [their] belongings away, get coffee, and/or engage in other non-work activities prior to [their] shift (or after before [they] clock out)." (*See, e.g., id.*, ¶ 2.) They all also state that they "have been trained

12
Case 2:18-cv-01809-WED    Filed 01/09/20    Page 12 of 17    Document 120

to begin working when the shift start bell rings unless [their] supervisor has altered [their] shift start time and informed [them] that [they] will start another time." (*See, e.g.*, *id.*, ¶ 4.)

The managers and supervisors all state in their declarations, "Employees in my department are not expected or permitted to work during the pre-shift clock-in period or during the post-shift clock-out period unless I have scheduled them to do so, and thereby ensure they will be compensated for all of their time worked." (*See, e.g.*, ECF No. 61, ¶ 3.) They further state,

> [i]f I were to see an employee performing work during the pre-shift clock-in period or during the post-shift clock-out period and the employee had not been scheduled to do so … I would coach and/or counsel the employee regarding Mercury's expectation that the employee not perform work during this time period.

(*See, e.g., id.*, ¶ 5.)

The production and maintenance employees who are also members of union leadership state in their declarations that,

> [i]f the Union was made aware that bargaining unit employees were working during the pre-shift clock-in period or during the post-shift clock-out period and were not being compensated, the Union would, at a minimum, address/discuss the situation with both the production operator and management and would potentially pursue a grievance related to such unpaid work if it had not been resolved to the Union's satisfaction.

(*See, e.g.*, ECF No. 39, ¶ 9.) However, the Union has never had to do this because no employee has ever raised this issue with union leadership. (*See, e.g., id.*, ¶ 8.)

Regarding overtime being unauthorized, the opt-in plaintiffs state that they understood that to only be "a prohibition of working extra shifts or multiple hours prior to a shift outside of the detailed procedures in the collective bargaining agreement." (ECF Nos. 25, ¶ 15; 26, ¶ 15; 27, ¶ 15.) But Mercury Marine's Gardiner asserts that "overtime would be anything that's outside of [the employees'] regular shift pattern." (ECF No. 28-1 at 72.) At his deposition he explained that employees are told during orientation that, "before [the employees are] to work overtime, it needs to be authorized by a member of management." (*Id.* at 71.)

Mercury Marine argues that this court should follow the reasoning in *Tom v. Generac Power Systems, Inc.*, denying a motion for conditional class certification. In *Tom*, a group of manufacturing employees alleged that Generac was impermissibly rounding their start and end times to reflect the scheduled start and end times and not the time they clocked in. As here, Generac's rounding policy resulted in the employees not being paid for any work performed before their scheduled start time or after their scheduled end time. The court stated that, "[i]t is first important to emphasize that Generac maintains a written policy expressly prohibiting manufacturing employees from working off the clock in the manner described by Tom, and it has presented evidence indicating that it abides by those policies in practice." *Tom*, 2018 WL 3696607, at *4. Given that express written policy,

> [a]ny work that Tom performed outside of his scheduled shifts thus occurred not as a product of a policy commonly affecting all hourly

14

> manufacturing employees at Generac but as a result of his own decision to work during times when Generac expressly instructed him and all other employees not to perform work.

*Id.* at *5.

*Abukar v. Reynolds Machine Co. LLC*, No. 19-CV-838-JPS, 2019 WL 6896154 (E.D. Wis. Dec. 18, 2019), reached the opposite conclusion on facts not dramatically different from the facts in *Tom*. *Abukar* also involved a motion for conditional class certification for a group of manufacturing workers who alleged that their employer engaged in impermissible rounding of their start and end times. Abukar contended that employees began work immediately upon arriving at the plant. He supported his motion with his own declaration and a declaration from another Reynolds hourly employee, "who confirm[ed] the implementation, scope, and effects of this rounding policy." *Id.* at *3. "In light of this evidence, the Court [found] that Abukar has made the requisite 'modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law.'" *Id.* (quoting *Brabazon v. Aurora Health Care, Inc.*, No. 10-cv-714, 2011 WL 1131097, at *2 (E.D. Wis. Mar. 28, 2011)). *See also Binissia v. ABM Industries, Inc.*, No. 13 C 1230, 2014 WL 793111, at *5 (N.D. Ill. Feb. 26, 2014) ("At this stage, it is sufficient that Plaintiffs have shown that ABM has a rounding policy that applied uniformly to all potential plaintiffs and that the policy appears to be inconsistent with FLSA regulations.").

It is undisputed that Robles and the putative collective action members are all subject to the same policy: they will be paid only for their scheduled shift unless prior approval for working additional time is approved by their supervisors. Having said that, only Robles testified that she was told she *had* to begin working upon punching in, even if it was before the start of her scheduled shift. No evidence has been offered that any other employee was so instructed.

It is also undisputed that Mercury Marine has a written policy similar to that in *Tom* that subjects employees to discipline for working overtime without prior approval. (*See, e.g.*, ECF No. 28-8.) And several employees have been so disciplined. (ECF Nos. 28-9, 28-10, 28-11, 28-12, 28-13.) Moreover, while Lockwood, Fox, and Hall all testified in their declarations that "[t]his work that I would perform prior to the scheduled shift-start time was integral to my assigned job duties and I could not efficiently perform my job without doing these tasks[,]" none of them testified that he or she cannot wait and perform these tasks once his or her scheduled shift starts. To the extent Robles and other employees work outside of their scheduled shifts without obtaining prior approval, they do so—as Hall testified—to make their day go smoother rather than because of a policy commonly affecting all hourly production and maintenance employees that deprived them of compensation.

And while Lockwood, Hall, and Fox all state generally that their respective supervisors knew they were working before the start of their shift because they could see

them working, whether that is in fact true will be an individualized determination for each supervisor. For example, Lockwood says that the work she performs before the start of her shift consists of talking to the person working at her workstation from the prior shift. Whether Lockwood's supervisor saw Lockwood talking to this other employee and recognized that it constituted "working" rather than just chatting will have to be determined, but the court will not be able to reach a general conclusion from that determination regarding what other supervisors who were supervising other employees knew.

In short, although the bar is set low for determining whether a class ought to be conditionally certified, there nonetheless is a bar. Conditional certification is not automatic. And here Robles has not demonstrated that she is similarly situated to the members of her proposed class such that the class ought to be conditionally certified. Therefore, the court will deny Robles's motion for conditional certification and need not address Robles's proposed notice.

**IT IS THEREFORE ORDERED** that Robles's motion for conditional class certification (ECF No. 24) is **denied.**

Dated at Milwaukee, Wisconsin this 9th day of January, 2020.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge